Bland, Chancellor.
It is clear that any one, so long as he stands before the court as the next friend of an infant or a feme covert plaintiff, being liable for costs, is therefore an interested and incompetent witness, (a) But where the object is not to favour the escape of such a next friend from any liability, arising from the suit’s having been improperly instituted or conducted by him, he may be made a competent witness by being discharged, and having another put in his place; and the court will, on application, at any time before the final hearing, allow a *551 change to be made for that purpose, on its being shewn to be necessary, and on the costs then incurred, being secured. (b)
Ordered, that Charles F. Mayer be, and he is hereby appointed next friend of the plaintiff Anna G. M. Helms, instead of the said Wandelohr, as prayed.
The commission to Bremen having been returned, and filed on the 15th of September, 1827; and it appearing that the depositions of the witnesses had been taken in the German language, with a translation; the defendants objected, that the case could not be heard until those depositions were more correctly translated; and the plaintiffs applied by petition, to have them translated accordingly.
10th January, 1828.
Bland, Chancellor.
This matter has an origin and bearing worthy of more attention than seems to have been usually bestowed upon it. I shall therefore here, once for all, avail myself of this occasion to advert, as briefly as may be, to the laws and principles upon which the parties have a right to have depositions correctly put into English before the case is set for hearing.
An English statute passed in the year 1362 sets forth, that great mischiefs had happened because the laws were not commonly known, for that they were pleaded, shown, and judged in French, which was much unknown; so that the people who plead, or were impleaded in the courts had no knowledge or understanding of that which was sued for, or against them; that the laws would be known and better understood in the tongue used in the realm; so that every man might the better govern himself without offending, and the better keep, save, and defend his heritage and possessions. And thereupon enacts, that all pleas which should be pleaded in any court, should be shewn, defended, answered, debated and adjudged in the English tongue; and be entered and enrolled in Latin. (c) By an act passed by the illustrious Long Parliament, in the year 1650, during the short lived Commonwealth of England, it was declared, that all report books, and other books of the law, and all proceedings in the courts of justice, should be in the English tongue only, and not in Latin or French, or any other language; and should be written in an ordinary, *552 legible hand, not in court hand. (d) Upon the restoration of the' monarchy, this law of the commonwealth was abrogated, and judicial proceedings were again obscured or concealed under a foreign language ‘much unknown.’ At length, however, common sense having again forced its way, it was, by a British statute, passed in the year 1731; after reciting that great mischief frequently happened, from the proceedings in courts of justice being in an unknown language, those who were impleaded having no knowledge or understanding of what was alleged for or against them in the pleadings of lawyers, who used a character not legible to any but persons practising the law; enacted, that all proceedings whatever, in any courts which concern the administration of justice, should be in the English tongue only, and not in the Latin or French, or any other language; and should be written in such a common, legible hand, as the acts of parliament are .•engrossed in; and not in a court hand; and in words at length, not abbreviated, (e)
From these legislative enactments, and from the history of the times, it is clearly deducible, that it had always been considered to be a matter of the highest importance, that justice should be openly and publicly administered ; and that, as a means of making that publicity, in all respects, most beneficial and available, all books of the law, and all judicial proceedings were directed to be published and conducted in the language of the people of the country. Hence it was, that the Norman conquerors of England, for their own advantage and security, had the laws written and administered in their own language; and that afterwards, when that domination had' worn away, or indeed been reversed, in the year 1362, the English was in a great degree, restored as the language of judicial proceedings; and that finally in the year 1731, the use of all foreign languages in the administration of justice in England was totally prohibited.
It is of the greatest importance to all, that justice should be in every sense publicly administered. It is the best security to the rights of the people and to the independency of the judiciary. By placing it in the power of every one to see, hear, and understand how the laws are administered; and by exhibiting before all a practical application of the rules by which the rights and interests *553 of all are governed, the understandings of the people are enlightened, and the peace of the community is preserved. By an open course of judicial proceeding, in the language of the country, it may be readily understood, if there be a fault, whether it be in the law, or in the administration of the law; if it be in the law, it may be amended and the judge sustained; if in the judge he may be held responsible, and the law be applied and enforced by a more skilful and worthy agent. It was evidently upon these considerations, that those English legislative enactments required the laws to be administered in the English language. Hence it is not merely as a matter of convenience to the court; but as a means of giving due publicity to judicial proceedings; and in order, that all suitors may know what is said for or against them, that all the pleadings, proofs and proceedings of the court must be instituted, or translated into the English language.
In Maryland, as well before as since the statute of 1731, all legislative enactments and judicial proceedings were expressed in English, and in no other language; (f) and therefore, by the common law of the state, independently of any positive act of the legislature, it may be regarded as a duty of all the courts of justice to have all their proceedings put into English before any judgment is pronounced upon the matter in controversy. And for the purpose of having a correct translation made' of the deposition or document it may be confided to a fit, competent, and sworn translator. (g)
Ordered, that Charles T. Flusser be, and he is hereby appointed to make and return, on oath, a full and correct translation of the said depositions as prayed by the foregoing petition.
On the 10th of February, 1830, Mordecai L. Flagler filed his petition in this case, in which he stated, that the defendant Lewis Helms had, by a certain instrument of writing, promised and obliged himself to pay to him the sum of $1,200 out of the sum which he might recover in this suit; by virtue of which the petitioner had and claimed to have a lien, to that amount on any sum which might be decreed to Helms and wife; and prayed that it might be ordered to be paid to him accordingly.
The defendant Lewis Helms by a petition, not on oath, filed on *554 the 1st of January, 1828, applied for leave to put in his answer, stating his reasons for not having done so sooner, which prayer being refused, he filed another petition, and various other proceedings were had in relation thereto; when on the 25th of March, 1830, by a writing signed by the solicitor of the plaintiffs and of the defendant Helms, it was agreed that the testimony taken in relation to the petition should apply also to the answer tendered by him to the supplemental bill, if received; and that if that answer was received the case should stand for hearing; and a general replication be filed to that answer also. On the next day the plaintiffs’ solicitor endorsed the proffered answer of Helms as follows : cthe complainants allow the within answer to be admitted into this cause, and the register is requested to enter, in behalf of the complainants, the general replication to it.’
The answer of Lewis Helms, thus introduced, admitted the facts and circumstances of the will, the partnership, and other matters charged in the bill as against the defendants Franciscus and Sadtler, and then stated that he found the plaintiff Anna residing in Chambersburg, Pennsylvania, keeping a small store, and reputed to be a widow, having an only son, Frederick A. Wandelohr, and as such he married her on the 12th of October, 1819; but he was deceived; for soon after his marriage he ascertained that she never had been married, and that she had also concealed from him the fact of her being then herself largely indebted; that within a few months after their marriage his wife solicited him to become surety for the payment of certain debts due from her son, and also from others to a large amount, which he refused; soon after which, she disposed of the most of their moveables, and went to Baltimore; and on the 7th of February, 1820, having caused him to be invited to an interview at the house of John H. Rathean, where she and her confederates locked him in a room with them, and by great threats of personal violence, insisted on his releasing all rights to any property to which she was, or might be in any way, entitled, and to leave the country; but he refused, and made his escape unhurt. That his wife Anna, having got possession of his family papers, and clothes, refused to deliver them to him; that she defamed and slandered him much, by which his character suffered greatly,in Baltimore. That a certain Jacob Merkle, who held his promissory note for the sum of $61 28, at the instigation of the plaintiff Anna, sued him for payment, and he being unable to pay, was, at the suit of Merkle, on the 6th of June, 1820, imprisoned in the *555 jail of Baltimore county, and so detained there until the 17th of July, 1821; that during his imprisonment his sufferings were various and extreme; because one Kugle had detained a trunk of his clothes, until he should be satisfied a small sum due to him, which he was unable to pay; because his wife refused to send him his clothes which she had in possession, and because he was utterly destitute and pennyless; but that, at length, Merlcle, being convinced by the statements made to him by this defendant, that his wife had deceived him, offered to release this defendant on his giving his promissory note for the principal and interest of the debt then due, with the fees, amounting to about $100 30, which he gave, and was accordingly discharged from jail. That, having heard of the threats of his wife and her confederates; and that she intended again to have him imprisoned, he went, on the 14th of November, 1822, to Pennsylvania, and after some months returned to get his papers and clothes, and to meet and repel the defamatory reports put in circulation by his wife, that he had left her in poverty, to take up with a lewd woman; that he then made propositions to her of peace and conjugal association, which were rejected ; that having again heard of the plans and threats of his wife and her confederates, to cause him to be again imprisoned, and being again urged to release all his rights in her property, and to leave the country, he did, without any intention to relinquish his claim, yield to the coercion of the circumstances with which he conceived himself environed, and on the 29th of August, 1823, signed a certain release or articles of separation, not, however, without his having some difficulty in finding a magistrate who could be persuaded by him to take the acknowledgment of such a writing, they believing it to be illegal and void; that the copy of this instrument set forth in the bill is spurious, the true copy being' the one left in the hands of Edward P. Roberts; that after executing this writing, he obtained some, not all, of his papers and property from his wife, and left Baltimore for New York, where he now resides; that soon after reaching the city of New York he was again, by the instigation of his wife, arrested at the suit of Merlcle, and held to bail; that the threats and conduct of his wife have been and are such, that he is afraid to return to Baltimore; that he has always treated her kindly, and is willing to continue to do so; that so late as November, 1827, he proposed to her peace, harmony, and re-union which she positively rejected; that the supplemental bill was filed by her with a hope and expectation *556 of obtaining a decree for her own exclusive benefit during his absence and without his knowledge, and that all the other matters and allegations in the bills are correct.
This answer was sworn to before a master in chancery in New-York, and certified by the mayor of the city of New York, under the corporation seal, in the usual manner.
26th June, 1830.
Bland, Chancellor.
This case standing ready for hearing, the solicitors of the parties were heard, and the proceedings read and considered.
After passing over the will of the late Carsten JVewhaus, and the various allegations of the parties, it appears from the proofs, that the testator’s sister, Geshe Adelheid JVewhaus, called-Bowers, of Bremen, in the will, was married to Frederick Bauer, of that place, on the 8th of July, 1807, and that she died on the 5th of January following; after having had but two children ; the first, Catherine Steinhauer, an illegitimate child, born before her marriage, and who died, unmarried and without issue, on the 16th of July, 1817; and the second a legitimate child, Anna G. Bauer, born on the 27th of August, 1807, after her marriage with Bauer; this sister of the testator never had any other children; and that Anna G. Bauer was, on the 23d of November, 1826, married to, and is now the wife of Biederich Meier.
It further appears, that the other sister of the testator, one of these plaintiffs, Anna Gebetha Margaretta JVewhaus, was born in Germany, and christened there on the 17th of February, 1775; that some time before the year 1800, she had an illegitimate child named Frederick A. Wandelohr, who is now living; that prior to the year 1815, she and her child came over from Germany to Maryland; and some time previous to the year 1816, having put off the name of JVewhaus, she went to reside in Chambersburg, in Pennsylvania; and there kept a small store; and was much respected by the name of Mrs. Wandelohr. At that place, on the 12th of October, 1819, in the forty-fourth year of her age, she was married to this defendant Lewis Helms. In the latter end of the month of November following, Helms and his wife came to Baltimore; and in a few days after their arrival, he caused a power of attorney, and a last will to be prepared by a notary public, intending them to be executed by his wife, for the purpose, as he supposed, of effectually conveying to him all her interest in the estate of the late Carsten JVewhaus. She positively refused to sign and execute those instruments; and was much distressed at *557 her husband’s proposing that she should do so. Soon after this, she returned to Chambersburg; and he remained in Baltimore. He has produced in evidence, some of her letters to him, all of which, do credit to her understanding; and the first of them dated on the 18th, 21st, and 29th of December, 1819, áre expressive of a warm affection for him; except, that shortly before the date of the last, it seems as if he had written to her something calculated to vex and distress her. In the same winter, or in the ensuing spring of 1820, she returned to Baltimore, and there had a meeting with her husband, and after a most boisterous quarrel, they parted, and have met no more. Letters and messages have since passed between them; but they have never since cohabited; nor even interchanged the common civilities of life.
The causes of this angry separation, would seem to have been her having, by a perusal of his family papers as he called them, obtained a knowledge of his really vicious, sordid character, as disclosed by those papers; and his pressing efforts to get possession of her fortune, which, with his character, as developed to her by his papers, had produced a conviction on her mind, that he had married her only for the sake of her money; and her representing herself to him as being, previous to their marriage, a widow, when the fact was not so. These causes of animosity have since, from time to time, been re-kindled, and more and more heated, until a state of settled dislike has been produced, which, as was admitted in argument by the solicitors of both of them, it is now altogether impraetible to remove, and have them again brought to cohabit together upon any terms.
It appears, that from the 6th of June, 1820, to the 17th of July, 1821, he was closely confined in the jail of Baltimore county, at the suit of Jacob Merkle, for a debt of no more than $61 28; and that during that time, his sufferings were, in every way, as great as could be produced by a state of the most abject friendless penury. It is said, that she was the instigator of this imprisonment, by having told Merkle, that if he would put Helms in jail, she would pay the amount in a short time; but on the other hand, it is also said, that Merkle was particularly incensed by the conduct of Helms himself, and said that he had treated him badly.
Some time after this, Helms and his wife, on the 29th of August, 1823, made, signed, sealed, and delivered an instrument in writing, in the following words, that is to say:
‘Lewis Helms, and his wife Ji. G. M. Helms, have formed a *558 mutual resolution to dissolve their marriage contract; and do hereby, by the present instrument of writing, voluntarily agree to separate themselves. Furthermore, L. Helms doth bind himself to renounce all the claim he has against his wife, A. G.. M. Helms, as well as the claim.he might have against the estate,of her deceased brother, Carsten JYewhaus. A. G. M. Helms, in return, renounces all claim she may have against L. Helms. Thus both parties mutually agree to live separate, and the debts which have been contracted or may be contracted hereafter-, to be paid by the person who contracts it.’
It appears, that so far from any duress, coercion, or threats having been used to induce Lewis Helms to execute this instrument of writing, itwas wished for, and even earnestly desired by him, as a means of protecting himself against any claim made by, or on account of his wife; and in consideration of that, he cheerfully relinquished all interest in her estate.' '
• It further appears, that since Helms and his wife parted, in the spring of the year 1820, he has never contributed in the slightest degree to her maintenance; that since their separation, he has resided some time in Pennsylvania; some time in this state; and for some time past has been, and now is, a resident of New York.. It is not shewn, that there has been any one point of time, since his marriage, when he was not in the very lowest condition of insolvency ; nor is it shewn that he has ever, since his marriage, made ' one single manly effort to rise above that condition. -She, since their separation, has always resided in Baltimore. She too, is represented as being very poor; but she has sustained a good character; has been industrious; has kept a boarding-house ; has earned a- living for herself; and her efforts to do so have been creditable to her. Of the proofs in relation to the assets of the testator, I shall say •nothing; because I shall decree that his executors account; and , upon that, the whole case will be sent to the auditor, for the purpose of stating the account from the proceedings and proofs now in the case, and such other proof as may be laid before him. ’
The supplemental bill- of revivor, by which, the court was first informed of the marriage of the plaintiff Anna, after the institution , of this suit, made her husband, Lewis Helms, a defendant; and represented him as having a residence beyond the jurisdiction of this court. Under such circumstances, no more could be done •than to warn him by publication, to appear and defend his rights; *559 and if he failed to do so, to assume the truth of the plaintiffs’ allegations, and decree accordingly. But after the day limited by the order of publication to appear, had elapsed, and before any decree had been passed, Lewis Helms came in by petition, and prayed to be allowed’to put in- the answer which he then tendered, in defence of his rights.
It was obvious that the matter in controversy, as regarded the executors; and as between Helms and his wife, could not be properly and finally disposed of, until it-was determined whether he was to be taken. as an active party or not. His pretensions covered the whole matter in dispute. He claimed to have the account taken with him: and to have the legacy paid entirely to him. And consequently,' to have allowed the case to proceed to an account between the plaintiffs and the executors alone, with a reservation of all the husband’s rights, as they might be introduced at a subsequent stage of the case, would have been, in effect, to pass a decree with an understanding, that a party who stood by, might, if he chose, have the whole matter re-examined and re*adjudicated. This, I refused to allow; and after some delay, the plaintiffs consented that the defendant Lewis Helms, should come in upon his preferred answer. Although I may come to the conclusion that it would be unjust to direct any part of this residuary legacy to be paid to him, yet he should be permitted to assist in taking the accountand have the privilege of excepting to it when reported by the auditor, to prevent his rights from being in any manner improperly involved, or finally compromitted to ■ his prejudice.
This is a case of a very singular complexity. The principal object of the suit is to recover a residuary legacy given by the late Carsten JYewhaus, to the plaintiff .Ama, and to ascertain how much of the testator’s estate should be embraced by that bequest. Another object is to have the whole of the legacy thus given, settled upon the plaintiff Anna, to the exclusion of her husband, the defendant Lewis Helms; except so much of it as has been pledged or assigned to the plaintiffs Sumwalt and McFarren. But if the court should determine that the defendant Lewis Helms, is entitled to any portion of it, then, to meet that event, Mordecai L. Flagler has introduced himself into this case, by his petition; and prayed to have his claim considered and satisfied, as the creditor and assignee of the defendant Lewis Helms.
There can be no doubt, from the pleadings, and proofs, that the *560 executors must be decreed to account and to pay over this residuary legacy. But for whose benefit ? Whether to the husband, or to the wife exclusively ? or to both in certain proportions ? or to their assignees ? These are important and preliminary questions. In this respect, this has the aspect of a bill of interpleader between this husband and wife, to determine their rights, while the executors stand by as stake-holders, ready to account and to pay as they may be ordered.
As to what must be considered as embraced by this residuary legacy. It was formerly an established general rule, that unless the legatee survived the testator, the legacy was extinguished; which has been altered by an act declaring that no devise or bequest shall lapse by reason of the death of the devisee or legatee, in the life-time of the testator; but shall take effect as if he had survived the testator. (h) Still, however, if a legacy be so given, that the legatee’s right depends on his being alive at the time fixed for its payment; or if the legacy be charged upon the real estate, and the legatee dies after the death of the testator, but before the time of payment, the legacy is lost, (i) Here, however, there has been no such lapsing of any legacy given by this testator. But it is a well established rule in the construction of wills, that wherever the testator has given the whole residue of his personalty to an individual, such residuary legatee, will take all the personal estate which is not otherwise well and sufficiently disposed of, whether a legacy falls in by lapse, or as being void in law; or in other words, where a legacy fails as to a particular object, it will not go to the next of kin, but must pass to those entitled under the residuary clause, (j)
In .this case it has been very satisfactorily shewn, that the testator’s sister,-Bauers, of Bremen, never had but two children. One of whom, Anna G. Bauers, only he has named in his will; of the other, Catherine, although living at the time of his death, he has taken no notice; and the four others, whom he names, never had any reality or existence. Consequently, the bequests of those four legacies being utterly void, they pass to this plaintiff Anna, as the residuary legatee; and must be accounted for, and paid by the executors, as a part of that legacy accordingly.
*561 The conflicting claims of this husband and wife present the next subject of inquiry, and the adjustment of them will require some care and attention.
According to our law, the marriage contract so strictly and intimately unites husband and wife, that they form, as it were, but one person; and in contemplation of law, the wife is considered as having scarcely any separate existence. The husband is the head, and therefore all the property of the wife belongs to him. This peculiar compact is of so lasting a character, that this court recognizes no power in the parties to vary the rights and duties growing out of it, or to effect, at their pleasure, any partial, much less a total dissolution of it during their lives; it is one by which the parties impose duties on themselves, and engage to perform duties with respect to their offspring; duties which are as much imposed for the sake of public policy as of private happiness; and which, therefore, they are never permitted to cast off at their pleasure. From these general principles it follows, that husband and wife are incompetent to contract with each other for the purpose of binding, or conveying property in any manner, directly from one to the other. And, having an inviolable right to the aid, comfort, and society of each other, they cannot separate or have any mere agreement between' themselves for a separation, enforced by a court of common law or equity. (k)
But, although it is, in general, true, that husband and wife can-" not, of their mere motion, dissolve the marriage contract, yet courts of law and of equity, without pretending to any authority either to sanction or enforce cohabitation or separation, will protect either party from the personal violence, or gross moral offence of the other; and, for that purpose, allow of, and even enforce a separation. This, however, is always done from necessity, and with a view to preserve the public peace, or to prevent the open contamination of the morals of society; as where a husband, indulging in a base, unmanly temper, was in the habit of beating his wife, or, with brutish feelings, introduced lewd women with her into his household. This pro tanto separation is not, however, an impeachment of that public policy by which' marriage is regarded as so sacred and inviolable in its nature; it is merely a stronger policy over-ruling a weaker one; and except in so far only as such *562 a separation is tolerated as a means of preserving the public peace and morals may be so considered, it does not, in any respect whatever, impair the marriage contract, or for any purpose, place the wife in the situation of a feme sole. (l)
It has been thought that, without putting at hazard any regulation necessary to insure conjugal felicity, a woman might, very beneficially for herself as well as her husband, be indulged with some more latitude of free will as to contracts, and a larger extent of individuality of character in relation to the- right of property. By the common law, her will and her rights, in those respects, are so. absolutely submerged and covered over by those of her husband, that she is not only made dependent on him for domestic happiness, Dut is tied to his fortunes, and deprived of all means of saving herself from the most abject penury in cases where, by means of a larger share of independent right, she might rescue herself and children from the wayward or the luckless course of her husband, and thus promote, instead of disturb, conjugal harmony. But those stern and ungallant general rules of the common law, by which marriage so sinks the wife under the absolute sway of the husband have been made, in many respects, to yield to a better feeling, and have undergone many wholesome modifications chiefly by the direct, or indirect application of the principles of equity.
*563 The father is the rightful and legal guardian of all his infant children; and in general, no court can take from him the custody and control of them, thrown upon him by the law, not for his gratification, but on account of his duties, and place them against his will in the hands even of his wife. (m) But although the courts of common law can enforce the rights of the father, they are not equal to the office of enforcing the duties of the father; and therefore, where the children have any property, which can give this court the means of acting in their behalf, it will protect them as well against the misconduct of their father as against their legal guardian. (n) Yet even a court of common law will not go so far as to hold nature in contempt, and snatch helpless, puling infancy from the bosom of an affectionate mother, and place it in the coarse hands of the father. The mother is the softest and safest nurse of infancy, and with her it will be left in opposition to this general right of the father, (o)
The common law vests a right in the wife to be endowed after her husband’s death out of all the lands of which he was seized during the coverture, unless she has a jointure legally settled upon her in lieu of dower; and her title to all lands held in her own right remains unimpaired by the marriage. But the incapacity with which she is covered by the marriage leaves her no means, at the common law, of dealing with the title she holds in her own right, or with her vested right to dower or jointure, either for her own, or her husband’s benefit, during the coverture; except by the formulary of a suit called a fine, and a private examination by the court itself. In lieu of this fine our law has directly restored her capacity to contract by means of a simple prescribed form concerning her vested right of dower, or her jointure, as well as respecting her own lands of which her husband is entitled to the rents and profits only during coverture, or which he may have acquired a vested right to hold as tenant by the courtesy. (p) The wife may take and hold property of any description to her sole and separate use, independently of her husband, which she may be empowered to alienate, encumber, give, or devise in any manner at her pleasure. And if she relinquishes her dower, or jointure, or sells, disposes of, or encumbers her lands held in her own right, *564 or her separate property for the purpose of paying his debts or of otherwise forwarding his views; or she becomes his surety, as she may in respect to her separate property; a court of equity will order her to be re-imbursed out of her husband’s property if any shall remain after his creditors have been satisfied, (q)
These and other instances which might be cited clearly shew, that a wife, during coverture, is not altogether so destitute of a capacity to contract respecting her property as is indicated by the general terms of the rule of the common law; but, that a husband and wife may, in particular situations, treat together effectually, if they treat upon fair and reasonable terms, (r)
It is now universally admitted, that a husband and wife are utterly incompetent, of themselves, by any agreement of their own, to effect even a partial dissolution of the marriage contract; but they are allowed to agree to live apart; and as auxiliary to that agreement, if the husband stipulate, through the instrumentality of a third person, to allow and pay to his wife a separate maintenance, such a stipulation is legal; and may be enforced against the husband, either in a court of law, or of equity; although it has originated out of and relates to that unauthorized state of separation in which the husband and wife have endeavoured to place themselves. A separate maintenance of this kind and pin-money are alike in this respect, that they are founded on a special contract, and only payable during the marriage. Pin-money is given gratuitously for her, personal and private expenditure ; it is an allowance always payable during co-habitation; whereas a separate maintenance is that provision which a husband contracts to pay to his wife where they have agreed to live apart and is payable only during the' period of separation; and in this respect differs from pin-money. The examination of a few of the decisions in relation to a separate maintenance of this’description will be sufficient to shew what is considered to be its general character in the courts of common law as well as in equity, (s)
*565 But in the case under consideration, there is nothing which can be construed as a contract on the part of the husband, to pay to his wife any thing as a separate maintenance. It is true, that they have, by an instrument of writing, agreed to live separate; and that he has released to her all claim to property, which he might have recovered as her husband; but he has not, in any manner, stipulated to provide for her a separate maintenance; and therefore, no adjudication in relation to the contract of a husband, for the separate maintenance of his wife, can be applied to, or need be considered in this case.
A mere agreement of a husband and wife to live apart, does not of itself, and without any contract to that effect, afford any ground upon which she can sustain a claim for separate maintenance. But if, by the cruel or immoral conduct of the husband, the wife cannot with safety and in decency, consort with him, then she may, upon the ground of such ill-treatment, come into a court of equity, and have a separate maintenance assigned to her by the court, out of her husband’s estate, of an amount proportioned to his means and circumstances.
There seems to have been some difficulty in England upon this subject; because it is said, of this claim’s being founded upon the misconduct of the husband; and of the ecclesiastical courts having the exclusive cognizance of all matrimonial cases; and as the kind of separate maintenance called alimony, is never allowed, but as a consequence of a divorce a mensa et thoro, that therefore, a court of equity could not take cognizance of a claim for separate maintenance, founded only on the misconduct of the husband, until after a divorce a mensa et thoro, had been granted by the ecclesiastical court. The difficulty of the English court of equity, it is evident, arises from the claim for a separate maintenance of this kind, involving the question of divorce, of which it has no jurisdiction. But it is admitted on all hands, that under such circumstances, the wife ought to be relieved, and should be able to obtain relief somewhere.
In England, during the short existence of the Republic, after the decapitation of the first king Charles, the ecclesiastical courts were abolished; and, in consequence thereof, the entire jurisdiction in all cases of alimony and of separate maintenance, devolved, as a matter of course and necessity, upon the Court of Chancery, as the only tribunal fitted and competent to decide *566 thereon, (t) And for the same reason, in several states of our Union, there being no ecclesiastical court, the cognizance of such matters has been held to belong most properly to the Court of Chancery. (u)
In Maryland, there never was an ecclesiastical court, and therefore, the High Court of Chancery always had, even under the provincial government, entire jurisdiction of such cases of claims for alimony, or for separate maintenance out of the husband’s estate, founded on his misconduct; (w) but this branch of the jurisdiction' *567 of this court, has been placed beyond all further question, by an act of assembly, -which declares, ‘that the Chancellor shall and *568 may hear and determine, all causes for alimony,' in as full and ample manner, as such causes could be heard and determined by the laws of England, in the ecclesiastical courts there.’ (x) Hence, I take it to be clear, that as the ecclesiastical courts of England would, in all cases of cruelty and adultery, pass a sentence of divorce a mensa et thoro, and grant alimony as a necessary and proper incident of such a sentence; or that the court of Chancery, after such a divorce, would award to the wife alimony, or a separate maintenance out of the husband’s estate ; (y) so here, although this court has no authority to pass any such sentence of divorce; or in any manner to meddle with the contract of marriage itself; yet, according to the provisions of this act, it cannot allow itself to receive any matter as a sufficient ground for granting alimony alone, which would not be a sufficient foundation in England, for granting a divorce a mensa et thoro, together with its incident alimony. (z)
*569 Taking this to be the only correct ground should be awarded in any case by this court; upon which alimony it follows, that in all *570 such cases, the wife must shew, either that her husband has been guilty of adultery, or cruel treatment of her. What is cruelty, it *571 is often difficult to determine. It seems however, to be admitted, that personal injury, and words of menace, importing the danger of *572 actual bodily harm, may be deemed cruel treatment, but not mere rudeness of language, (a)
*573 In this case, there is no evidence of either adultery or any such cruelty, as can entitle the plaintiff Anna, to alimony, properly so *574 called, and upon the grounds to which this court seems to have been confined by the act of assembly; even supposing it had been shewn, that Lewis Helms had any species of property, out of which a separate maintenance of this kind could be assigned to his wife.
But where a married women has been ill-treated, abused, or abandoned by her husband, and left without.the means of subsistence, a provision or separate maintenance may be secured to her by the Court of Chancery, out of her own fortune, which happens to be within reach of the court. The ground upon which this is done is, that as the interest of her fortune is intended for both of them, and is given to him by the laws, upon the tacit condition that he maintains her, if he either will not maintain her, or so demeans himself, that she cannot with safety or decency consort with him, to receive a maintenance at his hands, that interest shall be taken from him and given to her; since it would be very hard, that the party from whom the fortune moves should lose, and the other gain the whole; and that too, by his own misconduct. This pro *575 vision for the wife, made by the court, out of her own fortune, is always a present income during the husband’s life; and being intended to relieve her immediate necessities, is made payable to her separately and distinctly from her husband. But she cannot anticipate it by sale or incumbrance; because it continues only until the husband returns to his duty, and conducts himself towards her as he ought. *11n cases of this kind, the husband may be ordered to pay something towards the support of his wife, even pending the suit; and this is not considered as making a decree before the hearing; but only doing what the husband himself is obliged to do; maintain his wife until the case can be heard upon the merits. Thus guarding the wife against the possibility of future danger, and applying a remedy for her present wants. (b)
There is yet another occasion afforded by the nature of the wife’s title to property, of which the court avails itself to interpose its authority, against the legal claim of the husband; that is, when the husband requires the assistance of this court, to procure the possession of any part of his wife’s fortune, it will be refused to him, unless he makes a provision for her out of it, or shews that he has purchased it by having already adequately provided for her; or that it is of too small an amount to have any provision made out of it. (c) This peculiar claim is emphatically called ‘the wife’s equity.’ (d) It extends to all her equitable choses in action, and generally, to all equitable estates or interests falling within the jurisdiction of a Court of Chancery; but not to mere legal choses in action, to terms for years, or any chattel of which the husband may legally take possession. The habit of the court has always been, of itself, and without any application previously.made by the married woman, to direet an inquiry, when money has been carried over to her account, whether any settlement has been made; and, if none has *576 been made, to direct a settlement not upon the wife-.only, but upon the children also, (e)
To obtain the benefit of this equity the wife may come in and make her claim in any suit instituted by her husband; or she. may. by her next friend file a bill against him or his legal assignees in bankruptcy or insolvency; for neither the husband, nor any person standing in his place can have her fortune, without making a provision for her. The wife’s equity is a mere creature of this court; and is therefore never allowed, as between citizens of other states, according to the laws of which the wife is allowed no such equity.(f) It is a claim founded upon natural' justice; it resembles the paternal care which a Court of Chancery exercises for the benefit of orphans; and assuming the place of a parent, the court requires a settlement upon the wife, upon the presumption that it demands no more than would have been insisted on by a prudent father. But the court uses no active means of enforcing such a' settlement; it only proposes to him who asks equity, that he should do equity; and therefore, the husband cannot be obliged to make a settlement upon his wife. ’ If he does not' require the possession of his wife’s fortune, he must be allowed to receive the interest of it so long as he maintains her ; and to have the chance of taking the whole by survivorship. The wife’s equity is, in general, a provision made for her and her children of the marriage, to take effect after the death of the husband; but if the husband be insolvent, then the maintenance provided for her, is always a present one, and made to commence immediately; because the husband being under an obligation to maintain his wife, and his doing so, being the condition upon which the law gives him her property; therefore, his incapacity to maintain her,' owing to his insolvent condition, gives her an equitable right to claim an immediate provision for her own support. And where the incapacity of the husband to maintain his wife, arises from bankruptcy or legal insolvency, the court fastens that obligation upon the property itself. (g) This settlement is commonly made under the direct authority of the court; but that is not indispensably necessary; for if it be voluntarily made under circumstances in which it would have been ordered by the court it will be sustained. And all such *577 settlements are deemed valid even against the creditors of the husband. (h)
Here the wife claims the whole of this residuary legacy, to be settled upon her to her own exclusive use. There can be no doubt that she must have a provision made for her to take effect immediately ; and that upon the two last mentioned grounds of equity. First, because it is admitted that this legacy was given to her; and it appears that her husband has treated her ill, has taken up his residence in another state, and has left her entirely destitute of any aid from him. And secondly, even supposing no separation had taken place, and that he was living with her in harmony, she is entitled, upon the ground of c the wife’s equity,’ to a present provision ; because of its having been admitted and shewn that the legacy is hers, and that he is utterly insolvent. Her claim to some provision is, therefore, sustained by the clearest proofs and the most sound and best established principles of equity.
But, in cases of this kind, where, as in this instance, it has been submitted entirely to the court, to determine what provision shall be made, the husband has been almost always invited to make proposals of terms to be approved or rejected by the court, as to how much the wife shall have, and, in determining that, the court has exercised a discretion without being tied down to any precise rule. But it seems now to be the general opinion that the court will not of itself give the whole to the wife. (i)
In England it is considered, that in all cases where an infant, male or female, has been by any suit brought before the Court of Chancery for the purpose of having the person or estate of such infant properly disposed of, such infant thereby becomes, until the attainment of full age, a ward of the court, and may be governed and protected accordingly. Hence, where a female infant, who had thus become a ward of the court, was married in contempt of *578 its authority; and especially if it appeared that the husband had nothing to settle, and was a beggar, marrying her for the sake of her fortune, the court has been in the habit of not permitting him to touch that fortune, which was his sole object, and of having the whole settled upon the wife, (j)
In this instance the plaintiff Anna can, in no sense, be considered as a ward of this court, and, therefore, nothing of the nature of a contempt of the court can be imputed to her husband. Yet, those cases, in relation to wards of court, may be adduced to shew that the court, under some peculiar circumstances, allows itself to take into consideration the sinister views and objects of the husband in marrying his wife; and if the court can be satisfied that he was actuated chiefly or altogether by sordid motives; that he married the woman merely to come at her fortune, it will interpose to save the wife from such most grievous of all frauds, and have her whole fortune settled upon her exclusively. For, in those cases, there is nothing so very peculiar in being a ward of court; it is not so much upon the ground of any species of contempt or affront to the court itself; it is the corrupt motives of the husband; the fraud and delusion practised by him upon frankness and innocence, which affords the strong ground upon which the court plants its equity in directing the whole of the wife’s fortune to be settled upon her exclusively.
Here there is no direct proof of a fraudulent and corrupt intention on the part of Lewis Helms to marry this plaintiff Anna merely as a means of getting her fortune into his hands; but there are circumstances in the case which go far to shew that his motives were, by no means, as correct as they ought to have been. Her age; the pecuniary situation of the parties; the plan he formed so soon after marriage, although an ignorantly contrived one, to have the legacy transferred to him by a power of attorney, and a will executed by his wife; her refusal; the open rupture that soon followed, and the disclosure, from his papers, of his bad character, are facts which, when taken together, it will be difficult to reconcile with any other than sordid motives on his part.
I have met with no instance where the wife was not a ward of the court, in which the whole of her fortune has been settled on her, merely on the ground of the fraudulent or base motives of the *579 husband, and her having been deluded into a marriage for the sole purpose of enabling him to get hold of her property. But if, as has been said, this court has the power to go so far as even to declare the contract of marriage itself to be null and void, on the ground of its having been procured by terror, abduction, and fraud; (k) it would not be consistent with itself, and faithful to its best principles, if it were not to allow itself, under such circumstances as are here presented, to deal out to the wife a liberal and saving measure of justice; and, as the only means of preventing the deceiver from profiting by his delusion, to have the whole of her fortune settled upon her exclusively.
Let it, however, be supposed that Lewis Helms, in contracting marriage with his present wife, was actuated by no improper or unworthy motives; or that, even if he was, they cannot be allowed to form any sufficient reason for stripping him of the whole of this legacy, and that it is impossible the court should undertake, of itself, to give the whole to her; because it cannot assume or admit the position, that a married woman is entitled to the whole of her separate property to her separate use, in direct opposition to the clearest principles of the marriage contract. Yet the husband, at least, is in a condition to bind himself by his own voluntary consent; and, therefore, although the court itself cannot divest him wholly of his marital rights, yet he himself may freely release them; and if he does do so, such relinquishment may be received, ratified, and cast into the shape of a settlement, by the court, for the benefit of the wife and her children.
Where it appeared that the wife was entitled to a large legacy; that she had been clandestinely married; that the husband, after the marriage, had made a settlement equal to the whole amount upon her, and that in consideration thereof, the trustees had paid the legacy to the husband; it was held that the settlement of the whole, by the agreement and consent of the husband, was binding and good even against his creditors. (l) And where the husband had given a note to his wife, that if he should treat her ill, she should have her share of her mother’s estate to her own use. It was conceded that such a consent of the husband would have been sufficient as to the amount; and that the whole might have been settled upon the wife, (m) And where property had been be *580 qüeathed to the wife of the bankrupt for life; and it was claimed by the assignees of her husband; the court made a reference to receive proposals from the husband for a settlement on his wife, and he proposed that the whole should be settled on- her, which was ordered accordingly. It was said that there was a want of form in calling for proposals from the bankrupt husband; because he, of course, would propose that the whole should be given to his wife, rather than any part to his assignees, and that the assignees must have consented to the arrangement, (n) And it is sufficient that such consent of the husband be expressed in any clear and distinct form, either before or after the institution of the suit. As where the husband, upon'whose consent the quantum depended, had, in a letter to a third person, expressed a desire that the whole might be settled, it was held to be an honest, conscientious, and absolute appropriation of the whole fortune, and a settlement of the whole was decreed accordingly. (o)
From all which it appears to be well established that the husband, or his assignees, who stand in his place, may consent that the whole fortune shall be settled on the wife, and that if such consent be freely and deliberately given in any form, the court will hold the husband’s interest bound by it, upon the ground that Such agreement, without at all conflicting with the sacred principles and policy of the marriage contract, comes in aid of the équity which gives her a provision out of her own fortune, when she is not maintained by her husband; and also in aid of ‘the wife’s equity,’ which are now admitted, on all hands, to be wholesome and useful modifications of the rigid rules of the common law, and because such consent merely reduces to certainty that, as tó which the court had the power to exercise a just and liberal discretion.
In this case the agreement of the 29th of August, 1823, between Lewis Helms and Anna his wife, so far as it declares the marriage contract to be dissolved, must be regarded- as a nullity. But it is now well settled, that agreements of this description may be entirely void as to part, and valid as to the rest. If a husband and wife enter into articles of agreement to separate, and that she shall have a separate maintenance, the agreement to live apart is void; but the stipulation to pay a separate maintenance is legal, and may be enforced; and in many situations, husband and wife may treat together, provided they treat fairly. Here the subject of *581 this treaty between the parties was fair and honest; and whatever might have been the sufferings of Lewis Helms during his imprisonment for debt in the jail of Baltimore county, or however that suffering might have been brought upon him, there is not the slightest proof, that he was, as has been alleged, under any duress, apprehension of harm, or mistake, as to the nature and object of the agreement of the 29th of August, 1823, at the time it was signed by him. That instrument, on his part, was his unconstrained voluntary act, done with a full knowledge of all the facts, and of all his legal rights. By which writing he says, that he ‘doth bind himself to renounce all the claim he has against his wife A. G. M. Helms, as well as the claim he might have against the estate of her deceased brother Ca/rsten Newhaus.’ Now the only sound and sensible construction, that can be given to this agreement, compatibly with the full existence of the marriage contract, which the parties themselves cannot dissolve, is, that the husband has thereby consented, that his wife’s whole fortune shall be settled upon her, to the use of herself, exclusively of her husband as fully as may be, in all respects whatever. It is in this light, that I view this agreement. I take it as an explicit consent given by him, that his wife’s whole fortune may be settled upon her, and I shall decree accordingly.
But the plaintiff Anna had one son, an illegitimate child, born before her marriage with Lewis Helms. Can he be allowed to benefit by the proposed settlement ? This is the next point to be considered.
It is a general rule, that in making provision for the wife, the court extends it to the children of the marriage; and, in many cases, it is extended to the children of the wife by that or any other marriage. And although the wife may, at any time after her share has been ascertained, (p) come into court and relinquish her right, founded on what is called ‘the wife’s equity,’ yet subject to her release, her children acquire a vested interest in the provision, directed to be made, from the date of the order; so that if she dies after that period, without releasing it to her husband, they may, notwithstanding, come in and have the settlement perfected for their benefit. (q) In a settlement directed to be made, upon a *582 ward of the court, where the husband has been guilty of any fraud or gross misconduct, the fortune is always confined to the wife and her children by that, or-any other marriage; and even where there was strong reason, to believe,'that one of the-two children of the wife was illegitimate, as the court could not enter into that question, the settlement was made upon-the wife and both the children, (r)
The, English books, in reference to this subject, must be understood, however, as always speaking of legitimate children, who are capable of taking by descent. According to the law of England a bastard is, in many respects, considered as the son of no one; and -particularly as to the right to take by descent or distribution. He is reckoned as a. terminus a quo; the first of his family; he can, therefore, for most civil purposes have no heir or next of kin but the legitimate issue of his own body.- But,. in some other respects, and for all moral purposes his consanguine relations are regarded; for - it has, been held, that in the Court 'of Chancery a more liberal allowance for the maintenance of ah infant ■may be approved, in consideration of the circumstances of an illegitimate brother born of the same father and mother who was unprovided for. (s) And so too a bastard cannot marry his mother or illegitimate sister, (t) By the civil law, spurious children are allowed to take as heirs and next of kin of their mother equally, with those who are legitimate; and, claiming under the mother, they are, in general, entitled to the same rights as legitimate children. (u) These principles of the- civil law have been sanctioned and adopted as a part of our code by an act of assembly which declares, that the illegitimate children of a female shall be capable of taking and inheriting both real and personal estate from their mother, or from each other, or from the descendants of each other in like manner as if they had been born in-lawful wedlock, (w)
■. Whence it is clear, that on the death of the plaintiff Anna intestate, while sole, her illegitimate son Frederick would take as if he had been born in lawful wedlock; and therefore, upon those principles by which this subject is governed, I am of opinion, that he, as the inheritable, though bastard child of the plaintiff Anna, ought to be allowed "to - participate in the benefit of the settlement about *583 to be made upon his mother. Because it is evident, from the general spirit of the cases in relation to this subject, that the fortune of the wife is settled upon her and her children, looking to her blood, and confining the descent or distribution to those who would lawfully take from her as her immediate descendants. This bastard son Frederick is a child who, upon those principles, would take according to our law; and consequently, the settlement upon the plaintiff Anna must be extended to her son Frederick, and to any other child or children of her’s, who may, by the law of Maryland, take, as such, from her.
A settlement of this kind, is the peculiar creature of equity; the chief purpose of it is to save a married woman from the evil consequences of the misconduct, negligence, or misfortune of her husband. And, as in this instance, there is much reason to believe, that the wife may stand in need of all the safeguards the court can place about her; I shall limit her power of alienation, during coverture, by directing the rents and profits or income only, of the amount to be invested for her separate use, to be paid to her from time to time, and not by anticipation; so that she may not, by any undue influence, be deprived of that means of support, which it is the intention of the court to have most effectually secured to her. (x)
The claims of Sumwalt and McFarren, and of Flagler, only remain to be disposed of.
It is well settled, that a married woman is fully competent to come into this court and make a valid release of whatever she may be entitled to have awarded to her, upon the ground of cthe wife’s equity;’ and consequently, this plaintiff Anna, must be held, by this her bill, to have completely released all her claims and pretensions to the full extent of the mortgage or assignment of such her interest to Sumwalt and McFarren; and her husband Lewis Helms, having by his answer expressly admitted the validity of their claim, the whole of it, principal and interest, must be decreed to be paid to them, when the amount shall have been stated by the auditor.
With regard to Flagler’s petition, as he does not pretend to give his claim any other or stronger foundation, than that of an assign *584 ment from Lewis Helms, after the 29th of August, 1823; and as Lewis Helms could not after that time, when he had consented to the settlement of the whole upon his wife, have been, nor cannot now be allowed to take any part of-this legacy; Flagler, who only claims under him, cannot be permitted to take any part of it.' And consequently, without saying any thing of the propriety of Flagler’s petition, in ’other respects, it is perfectly evident, that it must be dismissed with costs.
Whereupon it is Decreed, that the said executors, John■ Franciscas and Philip B. Sadtler, account with Arina G. M. Helms and Lewis Helms, her husband, of and concerning the personal estate of the late Carsten JVewhaus, including as a part of the said residuary legacy, so much of the personal estate as was given by the last' will of the late Carsten JVewhaus, to Betsy A. Bauers, -Bauers, Henry A. Bauers, arid John D. Bauers, the four supposed children of the testator’s sister, -- Bauers, of Bremen, who never did in fact exist, by reason whereof the legacies so given to them, are void, and have become a part of the said residuary legacy. And the auditor is hereby directed to state the account in relation thereto; and also an account of the sums' now due, if any, to each one of the existing specifio legatees; and of -the sum due, if any, to the residuary legatee, after deducting therefrom the principal and interest of the debt due to Joseph Sumwalt and John McFarren. The said several accounts to be stated.by the auditor from the proceedings and proofs now in the case, and from such other proofs as riiay 'be laid before him. And the parties are hereby authorized to take testirriony in relation to the said several matters of account, before the commissioners in the city of Baltimore, or before any justice of the peace, on giving three days’ notice ás usual; provided, that the said testimony be taken and filed in the Chancery office, on or before the third day of August next. "
And it is further Decreed, that the whole of the said residuary legacy, after deducting therefrom the claim of Sumwalt and McFarren, be invested and settled in trust, so that the annual rents and profits, interest and dividends, be paid from time to time, and not by way of anticipation, to the said Anna G. M. Helms, to her sole and separate use, during her life, and apart from her husband, Lewis Helms. And if she dies in the life-time of the said Lewis Helms, then the whole to , go according to her appointment by will; and in case she makes no such appointment, then the whole to. go to her child, children or next of kin, *585 who, by the law of this state, are capable of taking as such from the mother. And if the said Anna G. M. Helms should survive her husband, Lewis Helms, then the whole of the said residuary legacy to vest in her, absolutely free and discharged from the said trust and settlement.
And it is further Decreed, that the said petition of Mordecai L. Flagler, be, and the same is hereby dismissed with costs, to be taxed by the register.
Under this decree, the case went before the auditor; the parties took testimony, and various proceedings were had. Helms and wife expressed their assent to this decree in substance, as it stood ; but prayed to have it so modified as to give her a greater control over the property than was allowed to her during her coverture; which the Chancellor refused to grant. After which, Anna and her son Wandelohr, applied to have a part of the sum directed to be settled on her, invested in real estate in Pennsylvania. In reply to which, the Chancellor said, it was very clear, that no investment could be ordered or allowed to be made beyond the jurisdiction of the court. The cáse was then referred to a special auditor, who made a report accordingly. After which, Anna G. M. Helms made an appointment in nature of a will, as allowed by the decree, and soon after died; so that the case abated. A bill of revivor was filed, which being answered, and the case submitted, a decree was passed on the 22d of June, 1832, by which the principal matters in controversy, were, in accordance with the previous decree, finally determined.

 Head v. Head, 3 Atk. 547.

 Witts v. Campbell, 12 Ves. 493; Melling v. Melling, 4 Mad. 261.

 36 Ed. 3, c. 15; Parke’s His. Co. Chan. 43.

 Scobell, 143, 4 Brod. Brit. Emp. 320; Parke’s His. Co. Chan. 134; 1 Westm. Hall, 5.

 4 Geo. 2, c. 26; 6 Geo. 2, c. 14; 3 Blac. Com. 318; Mitf. Plea. 8; Parke’s His. Co. Chan. 305.

 Kilty’s Rep. 249.

 Smith v. Kirkpatrick, 1 Dick. 103; Belmore v. Anderson. 2 Cox, 288; Fauquier v. Tynte, 7 Ves. 292; Atkins v. Palmer, 6 Com. Law Rep. 453; 1 Fowl. Exch. Pra. 373 ; 2 Fowl. Exch. Pra. 75, 135.

 1810, ch. 34, s. 4.

 Williams’ Exrs. 767, 780.

 Brown v. Higgs, 4 Ves. 709; S. C. 5 Ves. 501; Dawson v. Clark, 15 Ves. 417; Rothmahler v. Myers, 4 Desau. 215.

 Co. Lift. 112; Head v. Head, 3 Atk. 550; Worrall v. Jacob, 3 Meriv. 268; Westmeath v. Westmeath, 4 Cond. Chan. Rep. 60.

 Lister’s case, 8 Mod. 22; Rex v. Mead, 1 Burr. 542; Whorewood v. Whorewood, 1 Cha. Ca. 250; Williams v. Callow, 2 Vern. 752; Head v. Head, 3 Atk. 548; St. John, v. St. John, 11 Ves. 529; Wellesley v. Beaufort, 3 Cond. Chan. Rep. 1; Westmeath v. Westmeath, 4 Cond. Chan. Rep. 55.
The having obtained a writ of supplicavit, is no reason that the wife should elope, or be separated from her husband, for it is a security taken for the wife, upon,a supposition that they are to live'together. Head v. Head, 3 Atk. 550,; Clavering’s case, 2 P. Will. 202; King v. King, 2 Ves. 578; Heyn’s case, 2 Ves. & Bea. 182
Bread’s Case. — Charles, &,c. — To the Sheriff of Charles county, greeting, Whereas Jane, the wife of John Bread,- of your county, hath made supplication unto us, that she hath been grievously and manifestly threatened by her said husband of her life and of mutilation of her members, we being willing, in this behalf, to provide for the security of the said Jane, do command you, firmly enjoining, that you cause the said John Bread personally to come before you, and him compel to find sufficient security, under a certain penalty by you, for our use, reasonably to'be imposed, for which to us you will answer; that he, the said John Bread, the said Jane well and truly will treat and govern; and that the said John do not, by any means, do, nor procure to be done, any damage or evil to the said Jane of her body, otherwise than what to a husband, by cause of government and chastisement of his own wife, lawfully and reasonably belongeth. And if this before you to do he refuseth, then, that you take him, and him safe keep until he find security in form aforesaid. Dated 9th September, 1681.— Chancery Proceedings, lib. C.D.fol, 319.

 St. John v. St. John, 11 Ves. 531.

 Wellesley v. Beaufort, 3 Cond. Cha. Rep. 1; Lyons v. Blenkin, 4 Cond. Chan. Rep. 115; Jones v. Stockett, ante 429; Corrie’s Case, ante 503.

 Prather v. Prattler, 4 Desau. 33.

 Hannah K. Chase’s Case, 1 Bland, 229.

 Huntington v. Huntington, 2 Vern. 437; Pocock v. Lee, 2 Vern. 604; Tate v. Austin, 1 P. Will. 264; Bagot v. Oughton, 1 P. Will. 347 ; Quarles v. Lacey, 4 Mun. 258; Gosden v. Tucker, 6 Mun. 1.

 Hobbs v. Hull, 1 Cox, 445 ; Arundell v. Phipps, 10 Ves. 140.

 Raynes v. Lewes, Nelson, 88; Whorewood v. Whorewood, 1 Cha. Ca. 250 ; Head v. Head, 3 Atk. 295; S. C. 3 Atk. 547; Guth v. Guth, 3 Bro. C. C. 614; Legard v. Johnson, 3 Ves. 352; St. John v. St. John, 11 Ves. 526; Worrall v. Jacob, 3 Meriv. 256; Westmeath v. Westmeath, 4 Cond. Cha. Rep. 56; Rodney v. Chambers, 2 East. 283; Wallingsford v. Wallingsford, 6 H. & J. 485.

 Whorewood v. Whorewood, 1 Cha. Ca. 250; Oxenden v. Oxenden, Gilb. Eq. Rep. 1; Head v. Head, 3 Atk. 550; Anonymous, 2 Show. 282, 1 Mad. Chan. 386, note. —

 Purcell v. Purcell, 4 Hen. & Mun. 507; Prather v. Prather, 4 Desau. 33; Rhame v. Rhame, 1 McCord. 205.

 Galwith v. Galwith, 4 H. & McH. 477; Hewitt v. Hewitt, 1 Bland, 101.
Macnamara’s Case. — This case was brought before the court, by, a petition, filed on the 13th of October, 1707, by Margaret Macnamara against Thomas Macnamara, her husband. It stated, that she haying been before constrained to seek redress from the Chancellor against the cruel usage of her husband, was then, once more, compelled by his continued severities, daily manifested to the world, not only by threats', sufficient from a man of his ungovernable temper to frighten a poor helpless woman out of her life, but also by merciless stripes, the most scurrilous language unbecoming a man, by a tyrannical domineering carriage, too severe to be used even to slaves, and by a beastly lust, she blushed to name it, in the gratification of which, his indifferency in the use of white or black, clean or foul, was such, that nature’s law, self-preservation, dictated the danger of any commerce with him. That there was no safety for her under the same roof with him, he having frequently, in his mad raptures, exclaimed against himself for not making away with her. She therefore humbly implored protection from his barbarous cruelties. And prayed that she might be permitted to live separate from him; that he might be obliged to allow her such a reasonable maintenance, as, upon consideration of his circumstances, might be thought proportionable thereto; that he might be required to give good security for the performance of what should be ordered, so that she and her poor children might not be left destitute, and that he might be ordered to .deliver her clothes and other little necessaries to her, she being so stripped, that she had not wherewith to shift herself.
In this case, John Seymour, the Governor and Chancellor, associated to himself Major-General John Hammond, Judge of the Court of Vice-Admiralty, and one of the council of the Province. Whereupon, it was Ordered, that-Thomas Macnamara be forthwith summoned to appear. And the officer having made return, that he had gone out of town, it was Ordered, that he should appear on the 16th instant, to answer the petition, and he appeared accordingly, but refused to answer.
16th October, 1707. — Seymour, Chancellor. — The petition being read to. Thomas Macnamara, he was ordered to answer thereunto, which he obstinately refused to do, offering a plea, ore tenus, to the Chancellor’s jurisdiction of the matter, and pretending to support it by the practice of the spiritual courts in England, which in the infancy, low circumstances, and present constitution of this province, prevent us from being able to pursue here for want of such courts or maintenance for the proper officers of them. Wherefore, the Chancellor being convinced, not only by undeniable testimonies, but even by his own knowledge of the inhumanity and barbarity *567 of the said Thomas Macnamara towards his wife, manifested not only to the Chancellor, but to all Her Majesty’s council in assembly, before whom appeared, not long since, the said Margaret, so battered, bruised, and inhumanly beaten in most parts of her body, that had she not been of a constitution more than ordinarily strong, she could hardly have recovered it: and finding by daily expressions the said Thomas to be of a mad, turbulent, furious, and ungovernable temper; therefore, for the preservation of the poor petitioner’s life,
It is Ordered, that during the time the said Thomas and Margaret shall continue separate, and until they shall mutually reconcile themselves to each other, and cohabit, he, the said Thomas, shall allow and pay to the said Margaret his wife, £15 sterling per annum, by quarterly, or at least by half-yearly payments, to commence from the sixteenth day of October. And it is further Ordered, that he forthwith deliver unto her the wearing clothes and other small necessaries to her belonging, herein particularly specified, viz: one gown, Stc. &c. Ordered, likewise, that the aforesaid order be served immediately by the sheriff of Anne Arundel county upon the said Thomas, and that the said sheriff malee return thereof.
From this order the said Thomas prayed an appeal to His Grace the Lord Archbishop of Canterbury in the Arches; and that he might have a copy of the aforesaid order to transmit to England.
16i/i October, 1707. — Seymour, Chancellor. — Let the appeal be granted, as prayed; the said defendant performing, notwithstanding, the said order in all respects until such time as His Grace’s answ'er to the appeal be had; whereof the defendant is to take notice at his peril.
On the 18th of October, 1707, the sheriff made return, that he had served the order on Thomas Macnamara, who said that he would not obey it, neither could the law or any one oblige him to it. Upon which, an attachment was issued, and after some efforts to oppose or evade the process, he was taken into custody, and brought before the court, and submitted to obey the order. — Chancery Proceedings, lib. P. C. fol. 579.
This appears to have been the first suit of the kind here, in Chancery, by a wife against her husband for alimony; of which it had been previously determined, that the county courts had no jurisdiction. — 4 H. & McH. 477. It appears by the preamble of the act of 171S, ch. 16, (Parks’ Laws of Maryland,) that this Thomas Macnamara, who had come into the province as an Irish papist, and afterwards declared himself to be of the church of England, was a practitioner of the law in several of the courts of the province, and had been sundry times suspended here, and in the province of Pennsylvania, for his misdeeds, and re-admitted here on his fair promises of amendment, under the authority of the act of 1715, ch. 48, s. 12. But having then on a late suspension from his practice, (for a full account of the very grossly offensive causes of which, see Chancery Proceedings, lib. P. L. fol. 397, 413,) obtained Queen Anne’s order to be restored to it; and relying upon that royal order, as exempting him from the operation of the act of 1715, had treated the courts in the most indecent manner, despised their authority, and affronted their persons, which they had been cautious in punishing him for; being partly deterred by his great interest in England, and partly by his threatening, litigious, and revengeful temper, as well as his method of practising upon many unthinking people, to sur *568 prise them into certificates and affidavits in his favour, &c.; by which he had, at length, arrived to so intolerable a degree of pride and arrogance, that he had even attacked the governor himself in his character and government, and affronted the Governor and Chancellor publicly in the execution of his office, &c. &c. Whereupon, it was enacted, that Thomas Macnamara should be disabled from practising as an attorney or solicitor in any court of judicature of the province. And moreover, in general, that the magistrates should observe with strictness the demeanour of practitioners, &c. Dropping what related merely to Macnamara, the general provisions of this law were a short time after re-enacted, and yet remain in force, 1719, ch. 4.

 February, 1777, ch. 22, s. 14.

 Oxenden v. Oxenden, Gilb. Eq. Rep. 1; Hobbs v. Hull, 1 Cox, 445; Ball v. Montgomery, 2 Ves. jun. 195; Duncan v. Duncan, 19 Ves. 395.

 Wallingsford v. Wallingsford, 6 H. & J. 485.
Lynthecumb’s Case. — This case was a bill filed by Jane Lynthecumb against Gideon lynthecumb, her husband.
14th March, 1738. — Ogle, Chancellor. — Upon hearing counsel of both sides, it is Ordered, that the defendant pay unto the complainant after the rate of three thousand pounds of tobacco per annum, as a separate maintenance for her during the continuance of this suit, or until further order, if the estate of John Ford, late husband of the complainant, be left under the care and management of the defendant.
Some time after which, the case appears to have been again brought before the court.
December, 1739. — Ogle, Chancellor. — Upon motion of the complainant’s counsel, it is Ordered, that the defendant do not take from the complainant her bed, bedclothes, furniture to the bed, and her wearing apparel. — Chancery Proceedings, lib. J. n. No. 4, fol. 65, 146.
Scott’s Case. — This bill was filed on the 20th day of August, 1746, by Mary Scott, against Andrew Scott. In which it is stated, that the plaintiff had been married to John Abbington, who by his will appointed her his executrix, and soon after died seized and possessed of a very large real and personal estate, of which she ob *569 tained possession, and to the one-third of which she became entitled; besides which she was seized in her own right of several parcels of land; that, under these circumstances, she married the defendant, who thereupon took possession of all her personal estate and applied it to his own use; and at his earnest persuasion, she joined in conveying all her real estate to persons named by the defendant, for the purpose of having it re-conveyed to him in fee simple ; that after she had thus put every thing out of her own power, the defendant began and continued to use her with so much cruelty and inhumanity, that she could not cohabit with him without running a manifest hazard of her life, and an utter loss of all peace and quiet; that she was actually driven out of doors almost naked, and quite destitute of all the necessaries of life, and forced by him to fly for refuge and subsistence to her friends ; that he had declared he never would cohabit with her, but would allow her thirty pounds per annum, as a separate maintenance, with which she would have been content; but he has since refused to make her any allowance, and declared he would not allow her any thing unless he was forced to do so; and that he is now actually about to depart from this province for some part of Europe, as appears by the annexed affidavit. Whereupon it was prayed, that the defendant might be compelled to make to the plaintiff a competent allowance and maintenance; that she might have a writ of ne exeat provinciam against him, until the matter could be finally heard; and that she might have such other relief in the premises as might seem meet, &c.
With this bill there was filed an affidavit of George Parker, in which he states, that upon a difference between the defendant and his wife, he had declared he would not cohabit with her, but would allow her thirtypounds a year as a separate maintenance; after which he said he would allow her only twenty pounds, and then that he would not allow her any thing, unless he was forced to it; that he had said he would depart the province in October next; and that the plaintiff was destitute of any support, and had nothing except a negro wench and an old horse.
The defendant, by his answer, admitted his marriage with the plaintiff, but alleged that after the payment of the debts of the plaintiff’s former husband, her third of his personal estate was very small; that she had, as stated, conveyed to him a part of her real estate, but that it was in consideration of his relinquishing his interest in her dower to the children of her former husband, and of joining in conveyances to them of other parts of her real estate. This defendant denies that he ever used the plaintiff with cruelty or inhumanity, and avers that her behaviour was so indecent, abuseful, and turbulent, occasioned by her common and frequent drunkenness, that he could not cohabit with her; and was often obliged to leave his own home and go to a neighbour’s to be out of her way; that he had, however, resolved to bear with her, and had continued to do so, until he became convinced that she had been guilty of the greatest crime a wife can be guilty of to a husband, and had thereby brought a foul disease upon him; when he told her he could no longer cohabit with her. He denies that he ever drove her out of doom, but told her she might go and live where she pleased, and he would allow her thirty pounds a year; and she accordingly went away, taking with her all her clothes, a negro woman, and a horse, saddle and bridle.
October, 1747. — Ogle, Chancellor. — This case standing ready for hearing upon the bill and answer, the solicitors of the parties were heard, and the proceedings read and considered. Decreed, that the defendant pay unto the complainant thirty pounds current money yearly and every year, from the 20th day of August, 1746, during the joint lives of both parties, unless they shall be reconciled, and mutually *570 agree to cohabit together; and in case of such reconciliation aud cohabitation, the said payment to cease for the time to come, after such refconciliation, agreement, and cohabitation. And it is further Decreed, that the said Andrew Scott, on or before the last day of November, in this present year, give good security, to be approved of by this court, for the payment of the said thirly pounds' yearly and every year, as the same shall become due, to the use and separate maintenance of the said Mary, the complainant. And it is likewise Ordered, that the defendant'pay to the complainant the cost of this suit by.her in this cause laid out and expended. —Chancery Proceedings, lib. J. R. No. 5, fol. 237.
Govane’s Case. — This bill was filed on the 30th day of October, 1750, by Anhe Govane, by Charles Hammond, her father and next friend, against William Govane. The bill sets forth that the plaintiff, in the year 1740, being possessed Of a personal estate to the value of £700 and upwards, and entitled to dower as the widow of Thomas Homewood, deceased, in several very valuable tracts of land, married the defendant, by virtue whereof he possessed himself of her personal estate and dower, and has thereby greatly increased his fortune. That he is of such a perverse, turbulent, and violent temper, that she has for some years past lived a very uneasy life with him, not oníy from the vile and abusive language with which he has treated her, but from several cruel and unprovoked beatings and whippings she has causelessly received from him ; that from the threats he had uttered against her with a drawn sword, and other such destroying weapons in his hands, she was obliged in September, 1749, to leave his house; and for the preservation of her life, which she apprehended to be in great danger from his malice,' to swear the peace against him. Soon after which, by the mediation of friends, and upon his fair promises of kindness and moderation for the future, she returned to his family, and behaved herself as a dutiful and obedient wife. Rut he has since, without the least provocation or cause, violently abused her, and repeatedly threatened to kill her, and thereby forced her from his house; and threatens that he will revenge himself of her by selling all his estate and her dower interest, and carrying the proceeds to Rhode Island, Where h e has declared he very soon intends .to go, so as to leave her utterly destitute of any support or maintenance ; that he has warned several storekeepers not to trust her, with a malicious view of exposing her, contrary to all truth, as an expensive wife, and thereby offering a pretence for his -many acts of cruelty towards her, or of depriving her of the common necessaries of life. Whereupon it was prayed, that a separate maintenance might he awarded to her, suitable to his circumstances and the estate she brought him; and that he might, by a ne exeat provinciana, be prevented from leaving the province without the leave of the court, and to her prejudice. The plaintiff Ann made an affidavit before a justice of the peace of the truth of the facts thus set forth in her bill.
The defendant put in his answer, in which he admits their marriage, but avers that her personal estate was not so valuable as she alleged, and so far from increasing his fortune from the profits of her estate, the whole, consisting principally of negroes and her dower, could not he made to clear itself, but had actually brought him annually in debt; that soon after their marriage he discovered she had an exceedingly jealous disposition, insomuch so that no woman, even a relation or a white servant, could come into his company without exciting her jealousy; in consequence of which he made it his business to tarry at home, and when called abroad to return at night. That in April, 1749, in a jocular conversation in the hearing of the plaintiff, between *571 him and a woman in the neighborhood, who had bantered him for being intimate with a certain woman since dead, the plaintiff was thereupon seized with so implacable a jealousy and hatred against him, that notwithstanding his many asseverations of his innocency, she treated him with the most opprobious and scurrilous names, and continued to do so for many months. — [ Govane v. Govane, 1 if. and McH. 346.] That however perverse and turbulent his temper may be, which he does not admit, it cannot be more so than her’s with regard to him and all about her; that whatever weakness of temper he may have, he has nothing of rigour, severity, or cruelty in his nature, and never treated her with any vile or abusive language, but when she was most flagrantly the first aggressor, or laid hands on her but on just provocation and absolute necessity, when she committed the first assault, of which, were it proper, he could produce such instances as would astonish this court and all mankind. That in the summer of 1749, upon any difference happening between them, she frequently in the night left his house and went to that of his overseer’s, or to that of his overseer’s father’s, where she was kept, and spirited up to take the most violent steps to the dishonour of herself as well as of this defendant. That in September of the same year, she swore the peace against him; in consequence of which he was made to enter into a recognizance with sureties, from which he was afterwards discharged, and by the mediation of friends and mutual promises of reconciliation, she returned to live with him; that afterwards, when he was extremely sick and unable to help himself, she used him with the utmost cruelty, and expressed a hope that his then sickness would carry him off, and wished he might be in hell with his whores. That afterwards he was informed, and from various circumstances had strong reason to suspect and believe, that she had some improper and illicit intercourse with his overseer ; upon which he mildly remonstrated with her, and proposed to her that they should go and reside for a time in Rhode Island, until the scandal should die away, which she refused to do. Whereupon the next day he discharged his overseer, when she being present, without being spoken to or receiving the slightest provocation, walked off to the house of the overseer’s father, where she remained about ten days, and then went to the house of her own father, where she has since chiefly resided. He denies that he ever threatened her with a drawn sword, or any other weapon, or obliged her to leave his house ; and also denies that he ever intended, or does now intend, to leave this province. He admits that he had warned several storekeepers not to trust her, and will not pay any thing for her while she continues to live separate from him ; but he proposes to receive her again, and declares his readiness now to be reconciled to her, and again to cohabit with her, &c.
To this answer the plaintiff put in a general replication, upon which a commission was issued, and a great many depositions were taken and returned.
28tk July, 1752. — Taskeh, Chancellor. — This case standing ready and coming on to be heard accordingly, in presence of counsel on both sides, and the whole proceedings being read, appeared to be as before recited and set forth; whereupon, and upon reading the bill, answer, and depositions, taken and published in this cause, and also the account of Thomas Homewood, deceased, late husband of the complainant, his estate, as settled in the Prerogative court of this province, by which it appears that the complainant’s dividend of her said late husband’s personal estate, was £6 9s. 8 d. gold and silver currency, and £692 19s. 2d. current money of Maryland ; and upon debate of the matter, and hearing what could be alleged on both sides, this court doth accordingly Decree, that the defendant pay unto the complainant the sum of £163 11 s. current money, which is in proportion to £92 current money *572 per annum, for her support and maintenance, from the commencement of this suit until this present time. And it is further Decreed, that the defendant pay the complainant £92 for her separate maintenance on the last day of August, yearly, and every year, until they shall mutually agree to cohabit together. And the complainant, by her counsel, offering to accept of her dower in the lands her said late husband died seized of, and which the defendant is, in right of the complainant, possessed of or entitled unto, at the value of £50 current money per annum, to be allowed out of such annual sum as the defendant should be decreed, by this court, to allow the complainant for alimony or separate maintenance; therefore, if the defendant will give up and surrender by deed under his hand and seal to Col. Charles Hammond, in trust, for and to the use of the complainant the lands which the defendant holds in right of the complainant as her dower of the lands which her former husband Thomas Homewood was seized of, that the use and occupation thereof shall be deemed as a satisfaction for £50 per annum of the said £92 per annum. And that, moreover, the defendant give sufficient security in the penalty of £700 current money, to the said Charles Hammond, in his own name, but in trust for the complainant, to pay to the complainant, or to the said Charles Hammond to the use of the complainant £42 current money on the last day of August, yearly, and every year, until the complainant and defendant shall agree to cohabit together; the first payment to be made the last day of August, seventeen hundred and fifty-three. But in case the defendant will not surrender and give up the said land, on or before the last day of August, that then the defendant do pay the complainant the aforesaid £92 currency on the last day of August, yearly, and every year, until they shall mutually agree to cohabit together; the first payment to be made on the last day of August, seventeen hundred and fifty-three ; and give sufficient security in the penalty of £ 1,500 current money, to the said Charles Hammond in his own name, but in trust for, and to the use of the complainant. And that the defendant do pay all the costs of this suit.
After which the case was again brought before the court for further directions as to costs.
lith August, 1752. — Tasker, Chancellor. — It is Ordered, that the attendance of the commissioners in the execution of the commissions issued in this cause, and also of the clerk to the said commissioners, and their expenses be settled by the register of this court, and that the complainant and defendant immediately pay each of them one-half of the said charge; and that the money to be paid to the commissioners and clerk wait the event of this suit.
Immediately after which, the defendant prayed an appeal, upon which the case was again submitted.
14th August, 1752. — Tasker, Chancellor. — Upon motion this day of the defendant’s counsel for an appeal in this cause, and lodging a bond in court for the prosecution of the said appeal, and upon hearing the arguments of the counsel on both sides, this court hath thought fit, and doth accordingly Order, that an appeal be *573 granted. And notwithstanding which, as the defendant is obliged by law to support the complainant his wife, and that she ha3 no other support but what he ought to provide for her, and that without such provision she must be destitute of the necessaries of life: it is therefore Ordered by this court, that notwithstanding the said appeal, the defendant pay the sum of £163 11s. Od, current money to the complainant, and the sum of £92 current money per annum, according to the decree, until the appeal shall be determined.
Some time after, the parties having come to an agreement in relation to the matter in controversy, again submitted their case.
31si October, 1752. — Tasker, Chancellor. — Forasmuch as this court is this present day informed, as well by the complainant’s counsel as the defendant’s counsel, that since the decree made in the above cause, and since the granting an appeal from the said decree, that the complainant and defendant have come to the following agreement, viz. that the defendant shall pay the sum of fifty pounds current money immediately to the complainant; and also, that the defendant shall pay the sum of forty pounds current money to the complainant on the last day of August next; and the sum of twenty pounds current money per annum, on the last day of August yearly and every year afterwards, until the complainant and defendant shall mutually agree to cohabit together; and that the defendant shall convey and make over by deed, under his hand and seal, to Col. Charles Hammond, in trust for and to the use of the complainant, the lands which the defendant holds in right of the complainant, as her right of dower of the lands which her former husband, Thomas Homewood, was seized of; and that he the defendant shall give sufficient security, in the penally Of four hundred pounds current money, to the said Charles Hammond, in his own name, but in trust for the complainant; to pay to the complainant the sum of forty pounds current money on the last day of August next; and also the sum of twenty pouhds current money per annum, yearly and every year, after the last day of August next ensuing; and that the defendant shall immediately pay all the costs of the said suit; and that the complainant shall accept of the same in lieu of what was decreed her by this court for alimony, or separate maintenance. And it being prayed by both complainant and defendant, that the said agreement maybe made the decree of this court, it is therefore, by the mutual consent of the complainant and defendant, Decreed, that the defendant pay to the complainant immediately the sum of fifty pounds current money, and that the defendant also pay to the complainant the sum of forty pounds current money, on the last day of August next; and also, the sum of twenty pounds per annum on the last day of August, yearly and every year afterwards, until the complainant and defendant shall mutually consent and agree to cohabit together; and that the defendant convey and make over by deed, under his hand and seal, to Col. Charles Hammond, in trust for and to the use of the complainant, the lands which the defendant holds in right of the complainant, as her right of dower of the lands of her former husband Thomas Homewood was seized of; and that the defendant give sufficient security, in the penalty of four hundred pounds current money, to the said Charles Hammond, in his own name, but in trust for the complainant; to pay to the complainant or the said Charles Hammond, for the use of the complainant, the said sum of forty pounds current money, on the last day of August next; and also, the sum of twenty pounds current money per annum, yearly and every year, after the said last day of August next ensuing; and that the defendant immediately pay all the costs of the said suit; and that the complainant accept of *574 the same in lieu of what was decreed to her by this court for alimony or separate maintenance. But, forasmuch as EdwardDorsey, of the city of Annapolis, presentin court, offers in lieu and behalf of the said defendant, to become chargeable to the said complainant with the payment of the sum of twenty pounds, part of the aforesaid sum of forty pounds current money on the last day of August next, and with the further annual payments of the several sums of twenty pounds current money upon the last day of every August thence ensuing, until the complainant and defendant shall mutually consent and agree to cohabit together; and offers to give sufficient security for the performance thereof, which the said Charles Hammond, the complainant’s next friend, agrees to accept of, and that the defendant may be discharged of so much of this decree against him as the aforesaid Edward Dorsey has undertaken to pay. Therefore, it is Decreed, that if the said Edward Dorsey give good security in the penalty of six hundred pounds current money to the said Charles Hammond in his own name, but in trust for the complainant, to pay to the complainant or to the said Charles Hammond to the use of the complainant, for and towards her separate maintenance, the sum of twenty pounds, part of the said sum of forty pounds, on the last day of August next, and to make the further annual payments of the said several sums of twenty pounds current money on the last day of every August then ensuing, during the joint lives of the complainant and defendant, or until the complainant and defendant shall mutually consent and agree to cohabit together; that then the said security so given shall be deemed and taken, so far, for the said twenty pounds, part of the said forty pounds, and for the said several annual payments of twenty pounds, to be paid on the last day of every August thence next ensuing, during the joint lives of the complainant and defendant, or until the said William Go-vane and Ann his wife shall mutually consent and agree to cohabit together, in lieu and discharge of such part of the foregoing decree against the defendant. — Chancery Proceedings, lib. J. R. No. 5, fol. 820.

 Harris v. Harris, 1 Eccles. Rep. 204; Waring v. Waring, 1 Eccles. Rep. 210; Evans v. Evans, 4 Eccles. Rep. 310; Oliver v. Oliver, 4 Eccles. Rep. 429; Kirkman v. Kirkman, 4 Eccles. Rep. 438; Holden v. Holden, 4 Eccles. Rep. 452.

 Oxenden v. Oxenden, 2 Vern. 493 ; Sleech v. Thorington, 2 Ves. 560; Watkyns v. Watkyns, 2 Atk. 96; Bond v. Simmons,3 Atk. 20; Head v. Head, 3 Atk. 295; Ball v. Montgomery, 2 Ves. jan. 192; Legard v. Johnson, 3 Ves. 352; Wright v. Morley, 11 Ves. 12; Duncan v. Duncan, 19 Ves. 395; S. C. Coop. Rep. 254; Cooke v. Cooke, 1 Eccles. Rep. 178; Otway v. Otway, 1 Eccles. Rep. 203; Smith v. Smith, 1 Eccles. Rep. 220; Rees v. Rees, 1 Eccles. Rep. 418; Street v. Street, 2 Eccles. Rep. 195; Smyth v. Smyth, 2 Eccles. Rep. 293 ; Cox v. Cox, 2 Eccles. Rep. 531; Hamerton v. Hamerton, 3 Eccles. Rep. 17; Harris v. Harris, 3 Eccles. Rep. 153; Hawkes v. Hawkes, 3 Eccles. Rep. 231; Kempe v. Kempe, 3 Eccles. Rep. 233; Purcell v. Purcell, 4 Hen. & Mun. 607; Hewitt v. Hewitt, v. Bland, 101. —

 Jernegan v. Baxter, 6 Mad. 32; Foden v. Finney, 3 Cond. Chan. Rep. 739.

 The State v. Krebs, 6 H. & J. 36.

 Murray v. Elibank, 13 Ves. 1.

 Dues v. Smith, 4 Cond. Chan. Rep. 257.

 Aquilar v. Aquilar, 5 Mad. 414.

 Moor v. Rycault, Prec. Cha. 22; Nicholas v. Nicholas, Prec. Cha. 546; Brown v. Elton, 3 P. Will. 202; Sleech v. Thorington, 2 Ves. 561; Jewson v. Moulson, 2 Atk. 419; Middlecome v. Marlow, 2 Atk. 520; Bond v. Simmons, 3 Atk. 20; Salisbury v. Newton, 1 Eden, 370 ; Pryor v. Hill, 4 Bro. C. C. 139; Burdon v. Dean, 2 Ves. jun. 607; Langham v. Nenny, 3 Ves. 469; Macaulay, v. Philips, 4 Ves. 15; Franco v. Franco, 4 Ves. 528; Blount v. Bestland, 5 Ves. 515; Elibank v. Montolieu, 5 Ves. 737; Glaister v. Hewer, 8 Ves. 206 ; Murray v. Elibank, 10 Ves. 84; Elworthy v. Wickstead, 1 Jac. & Walk. 69; Elliott v. Cordell, 5 Mad. 150; Beams’ Orders, 464; Deeks v. Strutt, 5 T. R. 690.

 Vandenanker v. Desbrough, 2 Vern. 96; Adams v. Pierce, 3 P. Will. 12; Ex parte Coysegame, 1 Atk. 192; Beresford v. Hobson, 1 Mad. Rep. 363.

 Butler v. Freemen, Amb. 302; Wells v. Price, 5 Ves. 398; Ball v. Coutts, 1 Ves. & Bea. 303.

 Ferlat v. Gojon, 1 Hopk. Rep. 478.

 Moor v. Rycault, Prec. Cha. 22; Wheeler v. Caryl, Amb. 121.

 Nicholls v. Danvers, 2 Vern. 671; Rodney v. Chambers, 2 East. 283.

 Beresford v. Hobson, 1 Mad. Rep. 363.

 Grosvener v. Lane, 2 Atk. 180.

 Jernegan v. Baxter, 6 Mad. 32.

 Murray v. Elibank, 10 Ves. 90; S. C. 13 Ves. 5; Lloyd v. Williams, 1 Mad. Rep. 449; Fenner v. Taylor, 6 Cond. Cha. Rep. 453.

 Millet v. Rowse, 7 Ves. 420; Ball v. Coults, 1 Ves. & Bea. 301

 Harvey v. Harvey, 2 P. Will. 21; Bradshaw v. Bradshaw, 1 Jac. & Walk. 627.

 The Queen v. Chafin, 3 Salk. 66; Haines v. Jescott, 5 Mod. 168; S. C. Ld. Raym. 68.

 Stevenson v. Sullivant, 5 Wheat. 207, 262, note; Just. Inst. by Coop. 568

 1825, ch. 156.

 Parkes v. White, 11 Ves. 210; Brandon v. Robinson, 18 Ves. 429; Jackson v. Hobhouse, 2 Meriv. 486; Barton v. Briscoe, 4 Cond. Cha. Rep. 283; Woodmeston v. Walker, 6 Cond. Cha. Rep. 457; Jones v. Salter, 6 Cond. Cha. Rep. 463; Brown v. Pocock, 6 Cond. Cha. Rep. 464.